**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**DONALD J. TRUMP,**
**WALTINE NAUTA**, **and**
**CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**REPLY IN FURTHER SUPPORT OF GOVERNMENT'S**
**MOTION FOR *GARCIA* HEARING**

The Government files this reply in further support of its motion for a *Garcia* hearing and to address "the legal propriety of using an out-of-district grand jury proceeding to continue to investigate and/or to seek post-indictment hearings on matters pertinent to the instant indicted matter in this district." ECF No. 100 at 2. As set forth below, following the indictment in this case, the Government continued to investigate false statements by two witnesses in the District of Columbia, and the hearing before the Chief Judge in the District of Columbia appropriately stemmed from that investigation. The Government promptly notified this Court of its request for that hearing, and Mr. Woodward participated in the hearing without objection. The Government addresses these matters and the need for a *Garcia* hearing below.

**BACKGROUND**

In April 2022, a grand jury in the District of Columbia began investigating potential mishandling of classified documents by Donald J. Trump. Superseding Indictment (SI) ¶ 52. The

investigation derived from a referral to the Department of Justice by the National Archives and Records Administration. SI ¶¶ 38-50. The FBI opened an investigation on March 30, 2022, and the grand jury's investigation commenced the following month. SI ¶¶ 7, 51-52. Among other things, the investigations gathered evidence that Trump and Waltine Nauta endeavored to obstruct the investigation by the grand jury sitting in the District of Columbia. *See* SI ¶¶ 53-73.

During these investigations, the Government gathered evidence that Trump employee Carlos De Oliveira tried to enlist the director of information technology for Mar-a-Lago (identified in the superseding indictment as Trump Employee 4) to delete Mar-a-Lago security footage after the grand jury in the District of Columbia had issued a subpoena for the footage. As set forth in the Government's motion for a *Garcia* hearing (ECF No. 97 at 3), before Trump Employee 4's appearance before the grand jury in the District of Columbia, the Government informed Mr. Woodward that his concurrent representation of Trump Employee 4 and Nauta raised a potential conflict of interest, and Mr. Woodward responded that he did not have a reason to believe that his concurrent representation of Trump Employee 4 and Nauta raised a conflict of interest.

When Trump Employee 4 testified before the grand jury in the District of Columbia in March 2023, he repeatedly denied or claimed not to recall any contacts or conversations about the security footage at Mar-a-Lago. In testimony before the same grand jury, De Oliveira likewise denied any contact with Trump Employee 4 regarding security footage. The Government's evidence indicated that the testimony by Trump Employee 4 and De Oliveira was false.

On June 8, 2023, a grand jury in this district returned a 38-count indictment that charged Trump with unlawful retention of national defense information and charged Trump and Nauta with obstruction-of-justice offenses. The indictment did not name De Oliveira as a defendant or contain charges regarding the efforts to delete security footage. The Government thereafter continued to

investigate the false statements by Trump Employee 4 and De Oliveira in the District of Columbia. On June 29 and July 11, 2023, the grand jury issued two subpoenas for footage from three security cameras at Mar-a-Lago that related directly to De Oliveira's solicitation of Trump Employee 4 to delete security footage, as well as the false denials of the same by both witnesses. In addition, on June 20, 2023, the Government advised Trump Employee 4 (through Mr. Woodward) that he was the target of a grand jury investigation in the District of Columbia into whether he committed perjury there, in violation of 18 U.S.C. § 1623. Trump Employee 4's criminal exposure identified in the target letter was entirely due to his false sworn denial before the grand jury in the District of Columbia that he had information about obstructive acts that would implicate Nauta (and others).

The target letter to Trump Employee 4 crystallized a conflict of interest arising from Mr. Woodward's concurrent representation of Trump Employee 4 and Nauta. Advising Trump Employee 4 to correct his sworn testimony would result in testimony incriminating Mr. Woodward's other client, Nauta; but permitting Trump Employee 4's false testimony to stand uncorrected would leave Trump Employee 4 exposed to criminal charges for perjury. Moreover, an attorney for Trump had put Trump Employee 4 in contact with Mr. Woodward, and his fees were being paid by Trump's political action committee (PAC). *See In re Grand Jury Investigation*, 447 F. Supp. 2d 453, 460 (E.D. Pa. 2006) (explaining that potential conflicts can be "further heightened by the financial dynamics of the joint representation," where, for example, a client "did not independently select the" attorney but instead had the attorney "pre-selected for them by the attorney to the [person] who is the central focus of the grand jury proceedings").

On June 27, 2023, consistent with its responsibility to promptly notify courts of potential conflicts, and given the prospective charges Trump Employee 4 faced in the District of Columbia, the Government filed a motion for a conflicts hearing with the Chief Judge of the United States

District Court for District of Columbia (Boasberg, C.J.), who presides over grand jury matters in that district. The Government notified this Court on the same day, by sealed notice, of the filing in the District of Columbia. *See* ECF Nos. 45, 46. Mr. Woodward raised no objection to proceeding in the District of Columbia regarding Trump Employee 4. In fact, he responded that he "welcome[d] the Court's inquiry into [his] representation of" Trump Employee 4, Response at 1, *In re Grand Jury Subpoena*, No. 23-GJ-46 (D.D.C. June 30, 2023), but asserted that he had no "information to support the Government's claim that [Trump Employee 4] has provided false testimony to the grand jury," and that "even if [Trump Employee 4] did provide conflicting information to the grand jury such that could expose him to criminal charges, he has other recourse besides reaching a plea bargain with the Government. Namely, he can go to trial with the presumption of innocence and fight the charges as against him." *Id.* at 3. According to Mr. Woodward, if Trump Employee 4 "wishes to become a cooperating Government witness, he has already been advised that he may do so at any time." *Id.*

Chief Judge Boasberg made available independent counsel (the First Assistant in the Federal Public Defender's Office for the District of Columbia) to provide advice to Trump Employee 4 regarding potential conflicts. On July 5, 2023, Trump Employee 4 informed Chief Judge Boasberg that he no longer wished to be represented by Mr. Woodward and that, going forward, he wished to be represented by the First Assistant Federal Defender. Immediately after receiving new counsel, Trump Employee 4 retracted his prior false testimony and provided information that implicated Nauta, De Oliveira, and Trump in efforts to delete security camera footage, as set forth in the superseding indictment.

The Government anticipates calling Trump Employee 4 as a trial witness and expects that he will testify to conduct alleged in the superseding indictment regarding efforts to delete security

footage. Trump Employee 4 will very likely face cross-examination about his prior inconsistent statements in his grand jury testimony, which occurred while Mr. Woodward represented him, and which he disavowed immediately after obtaining new counsel.

**ARGUMENT**

I.    **Continuing to Investigate Trump Employee 4's Perjury Before the Grand Jury in the District of Columbia Was Entirely Proper**

It is well established that after defendants have been charged in an indictment, the Government may continue to use a grand jury "to investigate other persons who were not charged in the initial indictment[]" or to "explor[e] the possibility of filing additional charges against the same defendant[s]." Sara Sun Beale et al., *Grand Jury Law & Practice* § 9:16 (2d ed. 2022); *see United States v. US Infrastructure, Inc.*, 576 F.3d 1195, 1214 (11th Cir. 2009); *United States v. Alred*, 144 F.3d 1405, 1413 (11th Cir. 1998); *Beverly v. United States*, 468 F.2d 732, 743-44 (5th Cir. 1972). Even if the grand jury does not ultimately return new charges, "if, in the course of such legitimate investigative efforts, the prosecution obtains evidence that is relevant to the pending case, it can use that evidence at trial." Beale, *supra*, § 9:16 (citing, *inter alia*, *Alred*, 144 F.3d at 1413). To be sure, "the grand jury cannot be used 'solely or even primarily' to gather evidence against an indicted defendant." *US Infrastructure, Inc.*, 576 F.3d at 1214. But "[t]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority," and the defendant has the burden of showing that the Government's use of the grand jury was improper. *Id.* (citation and quotation marks omitted); *accord Alred*, 144 F.3d at 1413.

Following the indictment in this district, it was appropriate to use the grand jury in the District of Columbia to investigate false statements by Trump Employee 4 and De Oliveira. Neither individual was named in the indictment against Nauta and Trump, and venue for charges based upon their false statements in the District of Columbia would lie only in that district. It

5

therefore necessarily follows that the grand jury was not used "for the primary purpose of strengthening its case on a pending indictment or as a substitute for discovery," even if that "may be an incidental benefit." *United States v. Beasley*, 550 F.2d 261, 266 (5th Cir. 1977).

The decision in *Beasley* is instructive. After the indictment, the government gave a witness who had previously testified before the grand jury the opportunity to recant his false testimony, and the witness recanted and testified against the defendant at trial. *Id.* The court of appeals found that it was "not improper and indeed totally consistent with the duty of [federal prosecutors] to advise a witness that there exists a serious doubt or question about that witness' testimony." *Id.* The court determined that "the primary purpose of calling [the witness] before the Grand Jury [after the indictment] was not one of gathering evidence against" the defendant but instead "was to present to the Grand Jury the question of false statements under 18 U.S.C. § 1623 or provide an opportunity to recant." *Id.* at 266-67. A claim of improper use of the grand jury here is even further afield than in *Beasley*. Whereas the recanted testimony in *Beasley* was relevant only to the charges pending in the indictment, as described above, Trump Employee 4's corrected testimony is probative of "crimes not covered in the indictment." *US Infrastructure, Inc.*, 576 F.3d at 1214.

Not only was it appropriate to use the grand jury to investigate false statements by Trump Employee 4 and De Oliveira, it was appropriate to use the grand jury in the District of Columbia, where the statements were made and where venue for any false-statement charges would be proper. *See United States v. John*, 477 F. App'x 570, 572 (11th Cir. 2012) (unpublished) (concluding that venue for a violation of 18 U.S.C. § 1001 is "proper only in the district or districts where the defendant made the false statement"); *United States v. Paxson*, 861 F.2d 730, 733-34 (D.C. Cir. 1988) (upholding conviction for perjurious grand jury testimony in the District of Columbia material to antitrust charges subsequently brought in the Northern District of Georgia). And it was

necessary to bring to the attention of the Chief Judge in that district the potential conflict that arose from Mr. Woodward's representation of Trump Employee 4 in those proceedings. As "an incident of [its] supervisory power, a court has jurisdiction" to consider potential conflicts of interest that "relate[] to a grand jury proceeding within that court's control," and when the Government discerns such a potential conflict of interest, it "is not only authorized but is in fact obligated to bring the problem to that court's attention." *In re Gopman*, 531 F.2d 262, 265-66 (5th Cir. 1976).

Nauta is therefore incorrect when he claims (ECF No. 126 at 8) that the Government was "attempt[ing] to diminish the Court's authority over the proceedings in this case and to undermine attorney-client relationships." When a conflict arose in the context of Trump Employee 4's status as a putative defendant in the District of Columbia, the Government raised the conflicts issue there; now that a conflict arises from potential cross-examination of Trump Employee 4 in the case against Nauta in this district, the Government has raised the conflicts issue here. Nauta makes no showing of improper use of the grand jury, let alone the strong showing that is required to rebut the presumption of regularity in grand jury proceedings. The circumstances here foreclose a contention that the grand jury was used merely as a discovery tool to support the charges in the pending indictment, and Nauta's reliance (ECF No. 126 at 6-8) on cases that apply this established rule, including *In re National Window Glass Workers*, 287 F. 219 (N.D. Ohio 1922), is unavailing.[1]

---

[1] Nauta also errs to the extent he suggests (ECF No. 126 at 6 n.2) that the Government's earlier use of the grand jury in the District of Columbia was improper simply because the Government ultimately brought charges in the Southern District of Florida. Courts have long recognized that "the scope of [the grand jury's] inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime," because "the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning." *Blair v. United States*, 250 U.S. 273, 282 (1919). "[H]indsight is not the proper perspective for discerning the limits of a grand jury's investigative power," for the grand jury "must pursue its leads before it can know its

### II.    A *Garcia* Hearing Is Required

Where, as here, an attorney "has previously represented a person who will be called as a witness against a current client at a criminal trial" in a substantially related matter, that attorney "has an actual conflict of interest." *United States v. Ross*, 33 F.3d 1507, 1523 (11th Cir. 1994). A scenario that "presents defense counsel with the impossible dilemma of cross-examining one former client to benefit another current client . . . is wrought with conflicts." *United States v. Braun*, No. 19-80030-CR, 2019 WL 1893113, at *6 (S.D. Fla. Apr. 29, 2019); *accord United States v. Schneider*, 322 F. Supp. 3d 1294, 1297 (S.D. Fla. 2018), *aff'd*, 853 F. App'x 463 (11th Cir. 2021). When the Government intends to call defense counsel's prior client as a witness against the defendant, and "vigorous cross-examination" of that witness is required, defense counsel's "prior representation" of the witness renders him "unable ethically to provide that cross-examination." *Wheat v. United States*, 486 U.S. 153, 164 (1988).[2] Thus, Mr. Woodward's successive representation of Nauta and Trump Employee 4 squarely implicates his ethical obligations. Even if Mr. Woodward was "unaware" (ECF No. 126 at 4) at the time he represented Trump Employee 4 that his client might give testimony that would incriminate Nauta, he is certainly aware now.

This Court should decline Mr. Woodward's invitation (ECF No. 126 at 3, 9) to hold the entire *Garcia* hearing *ex parte*. While it may be appropriate to conduct portions of the hearing *ex*

---

final decisions." *Paxson*, 861 F.2d at 733-34. When the Government started the grand jury investigation in the District of Columbia, it could not know the full scope of the evidence that would be gathered, but from the outset, the investigation encompassed conduct that spanned the District of Columbia and the Southern District of Florida, and the investigation uncovered evidence of federal offenses in both districts. The Government's decision to ultimately bring charges in the Southern District of Florida and not in the District of Columbia does not call into question either grand jury's investigation. The Government notes that the grand jury in the District of Columbia completed its term on August 17, 2023.

[2] These cases and many others contradict Nauta's suggestion that a hearing is required only when a conflict arises from joint representation of multiple defendants and not from successive or concurrent representation of a defendant and "*mere witnesses.*" ECF No. 126 at 8; *see id.* at 2-4.

*parte*—for example if the Court were to find it necessary to inquire into attorney-client communications between Mr. Woodward and Nauta—the need for judicial inquiry into conflicts of interest derives from the interests of the Court *and* the Government in ensuring that the proceeding is conducted according to the applicable legal and professional standards. *See Wheat*, 486 U.S. at 160-61; *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975).

### III.     It Would Be Error to Suppress Trump Employee 4's Testimony

Nauta contends (ECF No. 126 at 4-5) that if the Court finds a conflict, it should preclude Trump Employee 4 from testifying at trial, rather than employ more routine remedies. That proposed remedy is contrary to precedent and—except for the district court ruling reversed in *United States v. Messino*, 181 F.3d 826 (7th Cir. 1999)—would appear to be unprecedented.

Courts have rejected exclusion of evidence as a remedy to avoid a conflict of interest, concluding that evidence that is "relevant to the Government's case" should not "be excluded to accommodate a defendant's choice of counsel." *United States v. Urbana*, 770 F. Supp. 1552, 1559 n.17 (S.D. Fla. 1991); *see Messino*, 181 F.3d at 830; *United States v. Lech*, 895 F. Supp. 586, 592-93 (S.D.N.Y. 1995). Exclusion of probative testimony "is an extreme sanction and would only harm the interests of justice." *Lech*, 895 F. Supp. at 592. A "defendant's choice of counsel" should not "take precedence over the Government's discretion in deciding what charges to prosecute and how to present its case." *United States v. Pungitore*, 910 F.2d 1084, 1142-43 (3d Cir. 1990).

*Messino*, on which Nauta principally relies (ECF No. 126 at 5), directly undermines his argument. There, the district court excluded testimony from defense counsel's former client to avoid a serious conflict of interest, emphasizing that the conflict came to light on the eve of trial and would have required disqualification of the attorney who had represented the defendant "in several related proceedings over the space of eight years," making it "'a practical impossibility to

9

appoint new counsel who has comparable experience and knowledge of th[e] case.'" 181 F.3d at 828-29 (quoting district court). The Seventh Circuit reversed, concluding that although counsel's disqualification would have "regrettable consequences," those consequences could not outweigh "the probative value" of the witness's testimony. *Id.* at 831-32. The testimony by Trump Employee 4 is similarly highly probative and unavailable from other sources, and the ample pretrial notice provided here presents the opportunity to ameliorate any potential negative consequences resulting from the conflict. For example, the Court may consider whether Mr. Woodward has taken adequate precautions to ensure that co-counsel is fully walled off from whatever client confidences Mr. Woodward learned during his representation of Trump Employee 4, *see, e.g.*, *Lech*, 895 F. Supp. at 589, and whether Nauta would agree to cross-examination of Trump Employee 4 by walled-off co-counsel, *see United States v. O'Malley*, 786 F.2d 786, 789-90, 793 (7th Cir. 1986).

To be sure, the *Messino* court "decline[d] to create a per se rule against excluding evidence to remedy a conflict of interest," *id.* at 830 (citing *United States v. Diozzi*, 807 F.2d 10 (1st Cir. 1986)), but Nauta has not identified any case, and the Government is unaware of one, in which a court has excluded evidence to avoid a conflict on facts remotely similar to this case, where the Government put Mr. Woodward on notice long ago about potential conflicts, and he is now seeking to affirmatively use those conflicts to gain a tactical advantage at trial by excluding highly incriminating evidence to the benefit of not only his own client but also a co-defendant (Trump) whose PAC is paying his legal fees. The Court should not countenance this maneuver.

## CONCLUSION

The grand jury proceedings in the District of Columbia were entirely proper. The Court should hold a *Garcia* hearing with Mr. Woodward's clients present and independent counsel available to provide them with advice should they so desire it.

10

Respectfully submitted,

JACK SMITH
Special Counsel
N.Y. Bar No. 2678084

By:    /s/ *David V. Harbach, II*
David V. Harbach, II
Assistant Special Counsel
Special Bar ID #A5503068
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Julie A. Edelstein
Senior Assistant Special Counsel
Special Bar ID #A5502949

Jay I. Bratt
Counselor to the Special Counsel
Special Bar ID #A5502946

Michael E. Thakur
Assistant Special Counsel
Florida Bar No. 1011456

August 22, 2023

11

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2023, I electronically filed the foregoing document with

the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of

Notices of Electronic Filing.

/s/ *David V. Harbach, II*
David V. Harbach, II